IN THE IOWA DISTRICT COURT FOR FLOYD COUNTY

| BILL MULLEN and MICHELLE MULLEN, | |
|---|---|
| Plaintiffs, | NO. LACV 030171 |
| v. | |
| HEINKEL FILTERING SYSTEMS, INC. and PEPPERL & FUCHS, INC., | PETITION AND JURY DEMAND |
| Defendants, | |

1. Bill Mullen and Michelle Mullen are residents of Charles City, Floyd County, Iowa.

2. Defendant Heinkel Filtering Systems, Inc. is a corporation organized and existing under the laws of a state other than the State of Iowa, with its principal place of business in New Jersey.

3. Defendant Pepperl & Fuchs, Inc. is a corporation organized and existing under the laws of a state other than the State of Iowa, with its principal place of business in Ohio.

4. This court has jurisdiction of this action because the damages sustained exceed the jurisdictional minimum.

## FACTS

1. In late November of 1996, Salsbury Chemicals, Inc. (now Cambrex, Inc.) ordered a stainless steel Heinkel inverting filter centrifuge from Heinkel, to be delivered in January of 1997.

2. The centrifuge was in fact delivered.

3. One of the components of the centrifuge was a proximity sensor sold to Heinkel by Pepperl & Fuchs.

EXHIBIT 1

Case 6:12-cv-02084-EJM   Document 2-2   Filed 12/03/12   Page 1 of 6

4. The centrifuge was installed in the summer of 1997 and, after final testing, was placed in operation sometime after November 6, 1997.

5. At all material times, Bill Mullen was an employee at the Cambrex, Charles City facility, working as a Pharma Operator in the maintenance department.

6. On the early morning of December 3, 2011, Bill was instructed to proceed to the pilot plant at the Cambrex facility to install filtering cloth in the Heinkel centrifuge. This was a task he had performed numerous times previously.

7. When Bill arrived, alone, at the pilot plant, he took a 5-foot ladder and stood on the platform of the centrifuge, unscrewed the housing, and opened the cap. He sought to disable the shaft by engaging the "e-stop."

8. After having installed and straightened out the cloth, the bowl of the centrifuge suddenly closed and pinned Bill's arms in the machine.

9. Bill was trapped and alone. He screamed for what he believed were hours until notice was finally taken of his condition. Coworkers entered the pilot plant and found him hanging from the centrifuge, with his arms pinned in the machine.

10. His coworkers were unable to free Bill and firefighters were called. The firefighters could not open the machine, even with the use of the jaws of life. Finally the machine was literally taken apart and Bill was freed and immediately taken to the local hospital and later transferred to Mayo Clinic.

11. As a result of his injuries, Bill has been damaged as follows:

A. He has incurred healthcare expenses.

B. He will incur healthcare expenses in the future.

C. He has been totally disabled and unable to work.

D. He will continue to be totally disabled and unable to work for indefinite period of time in the future.

E. He has endured pain and suffering.

F. He will endure pain and suffering in the future.

G. He has lost income.

H. His earning capacity has been permanently diminished.

I. In addition to pain and suffering, Bill sustained severe emotional distress during the time he hung from the machine, in the dark, until he could be rescued. He has continued to endure emotional distress since that time.

J. He will endure emotional distress in the future.

K. His ability to enjoy life has been impaired.

L. His ability to enjoy life in the future is also impaired.

12. Michelle Mullen was at all times Bill's spouse. As a result of the injuries and damages he has sustained, she has been deprived and will continue to be deprived of his support, financial and otherwise, and of his services and companionship.

## DEFECT CLAIM AGAINST HEINKEL

13. Heinkel sold and distributed the centrifuge.

14. At the time of the sale, it was engaged in the business of selling and distributing centrifuges.

15. The centrifuge, at the time it left Heinkel's control, contained a manufacturing defect that departed from its intended design in one or more of the following ways:

A. In failing to manufacture the "e-stop" in such a manner that when applied, it would disable the shaft and effectively prevent the centrifuge from operating.

B. In including as a part of the centrifuge, a frequency converter sold and distributed by Pepperl & Fuchs, which did not function at the time of Bill's accident, which caused the bowl of the centrifuge to close on its own, without any command from the PLC that was to control it.

3

16. These manufacturing defects were a cause of Bill's injury and resulting damage.

17. The centrifuge was in a defective condition at the time it left Heinkel's control in one or more of the following ways:

- A. In failing to manufacture the "e-stop" in such a manner that when applied, it would disable the shaft and effectively prevent the centrifuge from operating.

- B. In including as a part of the centrifuge, a frequency converter sold and distributed by Pepperl & Fuchs, which did not function at the time of Bill's accident, which caused the bowl of the centrifuge to close on its own, without any command from the PLC that was to control it.

18. A reasonable alternative, safer design could have been practically adopted at the time of sale or distribution.

19. The alternative design would have avoided the foreseeable risk of harm posed by the centrifuge.

20. The omission of the alternative design renders the centrifuge not reasonably safe.

21. The alternative design would have prevented Bill's injuries.

22. The design defects were a cause of Bill's injury and the resulted damages to Bill and Michelle.

WHEREFORE, plaintiffs pray for judgment against Heinkel in an amount sufficient to compensate them for the damages sustained, plus interest as provided by law and for the costs of this action.

## DEFECT CLAIMS AGAINST PEPPERL & FUCHS

23. Pepperl & Fuchs sold and distributed to Heinkel a frequency converter which Heinkel subsequently incorporated as a component of the centrifuge.

4

24. At the time of the sale, Pepperl & Fuchs was engaged in the business of selling and distributing frequency converters of the type sold to Heinkel.

25. The frequency converter, at the time it left Pepperl & Fuch's control, contained a manufacturing defect that departed from its intended design in the following way:

   A. The frequency converter was not functioning properly at the time of Bill's injury, which resulted in the bowl of the centrifuge closing on its own and without any command from the PLC, as designed.

26. The manufacturing defect was a cause of Bill's injury and the damages sustained by Bill and Michelle.

27. The frequency converter was in a defective condition at the time it left Pepperl & Fuch's control in the following manner:

   A. The frequency converter was not functioning properly at the time of Bill's injury, which resulted in the bowl of the centrifuge closing on its own and without any command from the PLC, as designed.

28. A reasonable alternative, safer design could have been practically adopted at the time of sale or distribution.

29. The alternative design would have reduced or avoided the foreseeable risk of harm posed by the frequency converter.

30. The omission of the alternative design rendered the frequency converter not reasonably safe.

31. The alternative design would have prevented Bill's injury and the damages to Bill and Michelle.

32. The design defect was a cause of Bill and Michelle's damage.

5

WHEREFORE, plaintiffs pray for judgment against defendant Pepperl & Fuchs, for an amount sufficient to compensate them for damages sustained, plus interest as provided by law, and for the costs of this action.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury on all issues so triable in this action.

*[signature]*

PATRICK M. ROBY AT0006750
KEITH LARSON AT0010159
ELDERKIN & PIRNIE, P.L.C.
316 Second Street SE, Suite 124
P.O. Box 1968
Cedar Rapids, IA 52406-1968
(319) 362-2137   FAX: (319) 362-1640
Email: pmroby@elderkinpirnie.com
ATTORNEYS FOR PLAINTIFFS